FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ JUN 13 2011 ★
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
THE TOWN OF BABYLON,

        Plaintiff,

   -against-

FEDERAL HOUSING FINANCE
AGENCY, EDWARD DEMARCO,
in his capacity as Acting Director of the
FEDERAL HOUSING FINANCE
AGENCY, FEDERAL HOME LOAN
MORTGAGE CORPORATION, FEDERAL
NATIONAL MORTGAGE ASSOCIATION,
OFFICE OF THE COMPTROLLER OF THE
CURRENCY, a component of the UNITED
STATES DEPARTMENT OF THE TREASURY,
and JOHN G. WALSH, ACTING
COMPTROLLER OF THE CURRENCY,

        Defendants.
-----------------------------------------------------------X

MEMORANDUM AND ORDER

CV 10-4916

(Wexler, J.)

APPEARANCES:

    Goldberg & Connolly
    By: Erik Ortman, Esq., William James Tinsley, Jr., Esq.
    66 North Village Avenue
    Rockville Centre, NY 11570
    Attorneys for Plaintiff

    Arnold & Porter
    By: Anthony D. Boccanfuso, Esq., Scott M. Border, Esq.
    399 Park Avenue
    New York, NY 10022
    Attorneys for Defendants
    Federal Housing Finance Agency and Federal National Mortgage Association

    Loretta E. Lynch, United States Attorney, Eastern District of New York
    By: Thomas A. McFarland, Esq.
    610 Federal Plaza
    Central Islip, New York 11722-4454
    Attorney for Defendants Office of the
    Comptroller of the United States Department of the Treasury, and John G. Walsh

1

WEXLER, District Judge

This is an action commenced by the Town of Babylon, New York ("Babylon" or the "Town") alleging that Defendants' actions with respect to the effect of a certain home improvement financing program on mortgage liens violate Federal and New York State Law. In particular, Defendants are alleged to have: (1) promulgated rules in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (the "APA"); (2) violated the National Environmental Policy Act, 42 U.S.C. §4332 ("NEPA"), by failing to conduct the required environmental impact analysis; (3) violated the Tenth Amendment to the United States Constitution by regulating, inter alia, local government and special assessments, and (4) tortiously interfered with contractual relationships between the Town and its residential homeowners, and local contractors.

Plaintiff seeks a declaratory judgment that Defendants have violated the above-referenced laws, and an order requiring Defendants to vacate and set aside all directives alleged to have been issued in furtherance of those violations. Presently before the court are Defendants' motions, Pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the complaint.

## BACKGROUND

I. The Parties

As noted, Plaintiff is the Town of Babylon. Plaintiff names as Defendants various federal entities, each of which is involved in the regulation of banking and/or the purchase and guarantee of home mortgages. Specifically, Defendants are: (1) the Office of the Comptroller of the United States Treasury (the "OCC"); (2) the Federal National Mortgage Association ("Fannie Mae") ;

(3) the Federal Home Loan Mortgage Corporation ("Freddie Mac") and (4) the Federal Housing Financing Agency ("FHFA"). Each of these entities, and the role they play in the housing market in the United States, are discussed below.

    A.    <u>OCC</u>

Defendant OCC is a bureau of the United States Department of the Treasury that acts as the primary supervisor of federally chartered banks. OCC has the statutory obligation to "prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. §93a. As such, it oversees a broad spectrum of bank activities, all aimed at ensuring that the interests of bank depositors and the public are protected. Pursuant to the National Bank Act and the Federal Deposit Insurance Act, OCC issues directives setting forth standards of safe and sound banking procedures. See generally 12 U.S.C §1831p-1(a)-(c). In particular, OCC issues guidelines with respect to credit underwriting practices that consider the value of collateral underlying bank loans.

In furtherance of its statutory duties, OCC has to power to issue informal recommendations and to institute formal enforcement actions in the form of administrative proceedings. In the course of such proceedings, OCC can serve notice of charges, as well as temporary cease and desist orders. The latter action requires immediate compliance by the institution to which to order is issued.

    B.    <u>Fannie Mae and Freddie Mac</u>

Defendants Fannie Mae and Freddie Mac are federally chartered private corporations that are commonly referred to as "Government Sponsored Enterprises "(GSE's"). Fannie Mae and Freddie Mac are in the business of, <u>inter alia</u>, purchasing home loans from banks and other

lenders. Fannie Mae and Freddie Mac own or guarantee the majority of residential home mortgages in the United States, and the combined debt and mortgage related assets of these GSE's are valued at more than $6 trillion. The position held in the home mortgage business by Fannie Mae and Freddie Mac make them the dominant force in that market. Indeed, Congress has found that these GSE's serve an important public function and their "continued ability . . . to accomplish their public missions is important to providing housing in the United States and the health of the Nation's economy." 12 U.S.C. §4501 (2). Thus, it is not a stretch to assume that lenders in the home financing market are guided in their decisions by Fannie Mae and Freddie Mac requirements. They are likely to give important consideration to GSE lending guidelines, and will be less likely to offer mortgages that do not conform thereto.

### C. FHFA

The FHFA is an agency independent of the Federal government that is charged with general supervisory and regulatory authority over, inter alia, Fannie Mae and Freddie Mac. 12 U.S.C. §4511(b). FHFA was created pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"). In September of 2008, FHFA became the conservator of both Fannie Mae and Freddie Mac. The conservatorships were precipitated by the economic crisis that followed the collapse in the housing market, and the concomitant drop in the value of assets held by the GSE's.

In its capacity as the federal regulator and conservator of Fannie Mae and Freddie Mac, FHFA's duties are broadly defined to include ensuring that:

(1) the GSE's operate in a safe and sound manner, and maintain adequate capital and internal controls;

> (2) the GSE's foster "liquid, efficient, competitive, and resilient national housing finance markets . . . ."
>
> (3) the GSE's comply with the rules, regulations, guidelines, and orders issued;
>
> (4) the GSE's carry out their "statutory mission only through activities that are authorized under and consistent with this chapter and the authorizing statutes; and
>
> (5) "the activities of each [GSE] and the manner in which such [GSE] is operated are consistent with the public interest."

12 U.S.C. §4513(a)(1)(B). The Director of the FHFA is charged with the duty to establish various standards for the GSE's, including those with respect to the management of market risk, overall risk management processes, and "such other operational and management standards as the Director determines to be appropriate." 12 U.S.C. §4513b (a).

In its capacity as a conservator, FHFA is charged by statute with the responsibility of, inter alia, identifying and minimizing further financial risk to the GSE's to ensure their future economic safety and viability. See 12 U.S.C. §4501(8) (noting importance of ensuring financial safety and soundness of GSE's). As conservator for Fannie Mae and Freddie Mac, FHFA is similarly empowered to take action: (1) necessary to put these GSE's "in a sound and solvent condition," and (2) "appropriate to carry on the business of the [GSE's] and preserve and conserve [their] assets and property." 12 U.S.C. §4617(D). Additionally, as conservator, FHFA is broadly entitled to "take any action authorized by [the federal banking statute], which [it] determines is in the best interests of the [GSE's] or the FHFA." 12 U.S.C. §4617(J)(ii).

Congress has specifically limited the power of courts to review the actions of the FHFA when acting as a conservator. Thus, it has provided that "no court may take any action to restrain

or affect the exercise of powers or functions of the Agency as a conservator or a receiver." 12 U.S.C. §4617(f). While the Director of the FHFA may apply for court enforcement for enforcement of its notices or orders, the court to which such action is addressed may not, except as specifically provided by statute "review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. §4635(b).

II.  The Town's "PACE" Program

In 2008, the Town created a program known as the Long Island Green Homes Program ("LIGH" or the "Program"). The Program seeks to encourage homeowners within the Town to undertake home improvements that reduce energy consumption, promote clean energy, create local jobs, reduce greenhouse gas emissions, and mitigate climate change effects. Programs similar to LIGH exist in a variety of jurisdictions across the country, and are generally referred to as "Property Assessed Clean Energy Programs ("PACE" programs).

A key component of PACE programs such as the one in effect in Babylon is the financing of "green" home improvements by the Town. Re-payment of such Town financing is secured by assessments made on the improved property in the financed amount. In Babylon, the financed amount constitutes a first priority lien on the property. In the event that the property is sold, the debt incurred under the PACE program is transferable to the new homeowner. Babylon asserts, and the court accepts for the purpose of this motion, that the typical cost of a PACE improvement is less that $9,000, and that reduced energy costs typically exceed the homeowners' monthly repayment obligations, which average less that $92. Babylon further asserts that there has never been a single default on a PACE financed repayment obligation.

III. Defendants' Actions With Respect to PACE Programs

At the core of Babylon's complaint are Defendants' actions in response to the priority position of liens created under its PACE program, vis a vis mortgage liens. On May 5, 2010, Fannie Mae issued a "Lender Letter," regarding concerns over the first priority lien status afforded under many PACE programs. While support was expressed for energy efficient initiatives, the importance of preserving the first lien status of mortgage loans was also noted. On the same day that Fannie Mae issued its May 2010 Lender Letter, Freddie Mac issued an "Industry Letter." Freddie Mac's statement noted that like Fannie Mae, it had begun to receive questions regarding PACE energy programs. Like Fannie Mae, Freddie Mac noted its support for energy efficiency programs, but also stated that the purpose of its letter was to "remind Seller/Services that an energy-related lien may not be senior to any Mortgage delivered to Freddie Mac."

On July 6, 2010 FHFA issued a statement entitled "FHFA Statement on Certain Energy Retrofit Loan Programs" (the "July 6 FHFA Statement"). The July 6 FHFA Statement notes that after a year long review of PACE programs, FHFA concluded that such programs "present significant safety and soundness concerns" to be addressed by Fannie Mae and Freddie Mac. FHFA noted that in many (but not all) states, PACE programs result in the acquisition of a first priority lien over an existing mortgage. The agency was careful to limit its statement only to those PACE programs affording senior lien priority over GSE loans. Thus, FHFA stated that "[n]othing in this Statement affects the normal underwriting programs of the [GSE's] or their dealings with PACE programs that do not have a senior lien priority." First priority lien programs, such as that in effect in Babylon, however, were noted to "pose unusual and difficult risk management challenges for lenders, servicers and mortgage securities investors." These

programs were distinguished from typical tax assessments, that are allowed priority status, because they lack the "traditional community benefits associated with taxing initiatives." FHFA concluded that first priority PACE liens, inter alia, "disrupt a fragile housing finance market and long-standing lending priorities.

In accord with its findings, FHFA directed Fannie Mae and Freddie Mac to undertake certain "prudential actions." With respect to those homeowners who have participated in a PACE program, no action was required. On a going forward basis, however, Fannie Mae and Freddie Mac were advised that they "should undertake actions that protect their safe and sound operations." Such actions were suggested to include, but not be limited to, adjusting loan to value ratios to reflect maximum permissible PACE loans, ensuring that loan covenants require approval or consent for PACE loans, tightening borrower debt to income ratios to reflect obligations that might become associated with the borrower's participation in PACE programs, and ensuring that mortgages in jurisdictions with PACE programs satisfy "all applicable federal and state lending regulations and guidance." Fannie Mae and Freddie Mac were additionally instructed to "issue additional guidance as needed."

The particular action taken by OCC with respect to this action was its issuance, on the same day that FHFA issued the statement described above, its own bulletin on its website (the "July 6 Bulletin"). The July 6 Bulletin, posted under the heading "News and Issuances," and labeled "Supervisory Guidance," stated that it was issued to "alert national banks to concerns and regulatory expectations," regarding PACE programs. It noted that loans made pursuant certain PACE programs were given priority lien status, thereby subordinating first and existing mortgage liens. OCC concluded that such subordination raised "significant safety and soundness

8

concerns" that should be considered by mortgage lenders and investors. Banks that do business in areas where such subordinating PACE programs exist were advised to consider the impact of those programs on their mortgage portfolios and lending activities. Banks were not directed to take any specific action. Instead, OCC advised that they were to consider steps to mitigate their exposures in order to protect their collateral. While steps such as requiring increased collateral and reducing loan to value limits, were suggested, no particular action was required.

On August 31, 2010, Freddie Mac issued a bulletin setting forth its position with respect to the purchase of mortgages subject to first priority PACE programs. After noting the statements of both FHFA and OCC regarding the safety and soundness issues raised by such programs, Freddie Mac announced that while it would not alter any obligations with respect to mortgages purchased prior to July 6, 2010 (the date of the FHFA and OCC statements), it would not purchase mortgages secured by properties subject to PACE obligations that provide for first lien priority. With respect to properties encumbered by first lien priority PACE obligations prior to July 6, 2010, Freddie Mac set forth specific conditions for refinancing, that would alter or extinguish the first priority status of such obligations. On the same day that Freddie Mac issued its August 31, 2010 statement, Fannie Mae issued an announcement that it was adopting the identical approach.

On February 28, 2011, FHFA wrote a letter to the Counsels of Fannie Mae and Freddie Mac (the "February 2011 Letter"). That letter reiterated FHFA's concerns with respect to first priority PACE programs and specifically referred to FHFA as "Conservator." The February 2011 Letter states that "in furtherance of the Conservator's duty to preserve and conserve the assets of the Enterprises," Fannie Mae and Freddie Mac were directed to "continue to refrain from

9

purchasing mortgage loans secured by properties with outstanding first-lien PACE obligations and carefully monitor through their seller-servicers any programs that create such first-lien obligations."

IV.     The Motions to Dismiss

Defendants FHFA moves to dismiss on its own behalf, as well on behalf of Fannie Mae and Freddie Mac, the entities for which it serves a conservator. OCC moves separately for dismissal.

FHFA's motion argues that HERA divests the court of jurisdiction to review its actions as conservator. Even if such statutory bar did not exist, FHFA argues that plaintiff's APA claim must be dismissed because no final agency action has occurred, Plaintiff lacks standing, FHFA has not issued any legislative rule or regulation subject to the APA rulemaking process, and Plaintiff can identify no statute that constrains FHFA discretion. Plaintiff's NEPA claim is argued to be subject to dismissal for lack of jurisdiction because "no major federal action" has occurred and NEPA's requirements do not apply. The Tenth Amendment claim is argued to be barred because FHFA has not interfered with any state or local tax assessment or lien power and because FHFA's action are a proper exercise of its Commerce Clause powers. The actions against Fannie Mae and Freddie Mac are argued to fail because these entities are private and not governmental. Finally, the state law claims for tortious interference are alleged to be preempted and subject to dismissal in any event because Babylon fails to identify any specific existing or prospective contracts that were breached or disrupted.

OCC argues that the Town lacks both Constitutional standing as well as particular statutory standing under NEPA. Even if such standing were to exist, the issuance of the July 6

10

Bulletin is argued to be beyond judicial review because it does not constitute final agency action. Moreover, the July 6 Bulletin is argued to be nothing more than general policy statement, and not a legislative rule subject to the notice and comment requirement of the APA. The Tenth Amendment claim is argued to be subject to dismissal because OCC's action is bank regulation fully authorized by the Commerce and Necessary and Proper Clauses of the Constitution. Finally, the state law claim alleging tortious interference with contract is argued to be outside of the Federal Tort Claims Act's waiver of sovereign immunity.

## DISCUSSION

I.  Standards on Motion to Dismiss

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court held that to avoid dismissal a plaintiff would be required to plead enough facts "to state a claim for relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009). While heightened factual pleading is not the new order of the day, Twombly holds that a "formulaic recitation of the elements of a cause of action will not do. Twombly 550 U.S. at 555. In the context of a motion to dismiss, this court must, as always, assume that all allegations set forth in the complaint are true and draw all inferences in favor of the non-moving party. Plair v. City of New York, 2011 WL 2150658 *2 (S.D.N.Y. 2011). The court must ensure, however, that the complaint sets forth "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 57 (2d Cir. 2010). A pleading that does nothing more that recite facts and bare legal conclusions is insufficient to "unlock the doors of discovery . . . and only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950. While a Rule

12 motion is directed only to the sufficiency of the pleading, the court determining the motion may rightfully consider written documents attached to the complaint as well as documents incorporated thereto by reference and those of which plaintiff had knowledge and relied upon in commencing the action. See Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Plair, 2011 WL 2150658 *3.

II.   Disposition of the Motion

   A.   FHFA's Motion

FHFA's argument that HERA divests this court of jurisdiction is dispositive. As noted above, HERA clearly and specifically limits the power of courts to review the actions of the FHFA when acting as a conservator. Thus, 12 U.S.C. §4617(f) provides that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." 12 U.S.C. §4617(f).

Babylon asks that this court issue orders declaring that FHFA's statements with respect to the priority of PACE financing are outside of its authority, and asking this court to "vacate, set aside and/or nullify" its actions and those of Fannie Mae and Freddie Mac. Babylon seeks to avoid the jurisdictional bar by arguing that FHFA was acting as a regulator of Fannie Mae and Freddie Mac, and not as a conservator. Thus, it is argued that the jurisdictional bar with respect to "conservator" acts does not apply. The court disagrees.

FHFA has acted a conservator of Fannie Mae and Freddie Mac since September of 2008 – long before any action was taken with respect to PACE programs. Babylon creates no material issue of fact precluding dismissal here by arguing that FHFA was acting only as a regulator or supervisor in issuing its statements. It is clear that any action with respect to PACE financing

was taken, as stated specifically by FHFA in its February 2011 Letter, in furtherance of its broad powers as conservator of Fannie Mae and Freddie Mac, to ensure the continuing safe and sound operation of these GSE's. It matters not that earlier statements of FHFA did not use the word "conservator." FHFA was, in fact, at all times, the conservator and regulator of Fannie Mae and Freddie Mac. The court is unwilling, and indeed, cannot imagine how, it would venture to parse certain actions as regulatory in nature, and others pursuant to FHFA's duties as conservator. This is especially true where, as here, the challenged conduct of FHFA is broad action addressed to a potentially nationwide issue affecting the safety and soundness of the GSE's that it oversees. In sum, there is no question that the acts sought to be nullified here were undertaken pursuant to FHFA's broad and important statutory charge as conservator of the GSE's. As such, this action is barred by 12 U.S.C. §4617. Cf. Freeman v. F.D.I.C., 56 F.3d 1394 (D.C. Cir. 1995) (broadly construing 12 U.S.C. §1821(j), the jurisdiction withdrawing provision with respect to actions commenced against Federal Deposit Insurance Corporation as a conservator or receiver).

    B.    <u>OCC's Motion</u>

    1.    <u>Standing</u>

In view of the fact that the jurisdiction withdrawal statute referred to above does not apply to the OCC, the court turns to consider that entity's separate motion to dismiss. Initially, OCC argues that Babylon lacks standing to bring this action.

Article III of the Constitution identifies those matters that may be resolved through the judicial process. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). The plaintiff bears the burden of establishing three elements to confer standing. First, the plaintiff must have suffered an "injury in fact," defined as "an invasion of a legally protected interest which is (a)

concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Id. (citations omitted). An injury is "particularized," if effects the plaintiff in a "personal and individual way." Id. at 561 n.1. Second, the plaintiff must show a causal connection between, the injury alleged and the conduct complained of, such that the injury is "fairly traceable" to the challenged action, not the result of the a third party's action who is not before the court. Id. at 560. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id. at 560-61 (citations omitted); New York Coastal Partnership, Inc. v. U.S. Dept. of Interior, 341 F.3d 112, 116 (2d Cir. 2003).

The court recognizes that the "manner and degree of evidence" must be reviewed in accord with the stage of the litigation. Lujan, 504 U.S. at 561. The Second Circuit has noted that the Supreme Court "has commented on the lowered bar for standing at the pleading stage, stating that 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Connecticut v. American Elec. Power Co., Inc., 582 F.3d 309, 333 (2d Cir. 2009), quoting, Lujan, 504 U.S. at 561. Nonetheless, the court must consider whether standing has been sufficiently alleged to survive the plausibility standard set forth above with respect to a motion to dismiss. Additionally, the court is mindful that where, as here, the plaintiff's asserted injury arises from the government's action with respect to an entity other than the plaintiff, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. Lujan, at 562 (citations omitted).

OCC argues that the Town cannot show the element of redressability sufficient to survive this motion to dismiss. The court agrees. The only action at issue here with respect to the OCC

14

is its posting of the July 6 Bulletin, one of many bulletins routinely posted on the OCC website that set forth supervisory guidance to regulated banks. Babylon seeks to have OCC withdraw that guidance. Even if the court were to grant the requested relief with respect to OCC, such action would not require banks to authorize mortgages subject to first lien priority PACE programs. Indeed, banks would still be required, both by OCC regulation and their own prudence, to consider all financial factors, including the existence of first priority liens, in determining whether to grant particular mortgages.

It is worth repeating that the July 6 Bulletin did not direct banks to refuse to grant mortgages on properties encumbered with first-priority PACE loans. Rather, it merely suggested that such liens be the subject of consideration, and noted a variety of steps that might be considered in the mortgage decision making process. Even assuming the truth of the Town's allegation that mortgage decisions will impact the success of its PACE program, the withdrawal of the OCC bulletin, given the banks' independent goal of minimizing risk, would still likely leave banks somewhat averse to granting mortgages subject to existing first priority liens. While the OCC Bulletin may have alerted the banks to the existence of first priority PACE liens, it does not require bank action, and is certainly not the only factor in a multi-faceted credit decision. Because it is clear to the court that any order it issues with respect to the July 6 Bulletin and the acts of OCC, would not redress the problem asserted with respect to the viability of Babylon's PACE program, the Town has not pled redressability sufficient to confer Article III standing necessary to pursue its claim against OCC. Accordingly, the claims against OCC are dismissed for lack of standing.

CONCLUSION

for the reason set forth above, the motions to dismiss are granted. The Clerk of the Court is directed to terminate the motions and close the file in this matter.

SO ORDERED

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
June 13, 2011

16